UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MTA METRO-NORTH RAILROAD<br>AND STATE OF CONNECTICUT | : |
| | : |
| Plaintiffs, | : |
| | :. |
| v. | :     CIVIL ACTION NO. 3:05 CV 881 (PCD) |
| | : |
| BUCHANAN MARINE, L.P.<br>NEIL C. OLSON | : |
| | : |
| Defendants. | :     July 28, 2006 |

## PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR OPPOSITION TO DEFENDANTS'
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56, the

undersigned Plaintiffs, MTA Metro-North Railroad ("Metro-North") and State of Connecticut

(collectively "Plaintiffs"), hereby file their Memorandum in Support of their Opposition to

Defendants', Buchanan Marine, L.P. ("Buchanan") and Neil C. Olson (collectively

"Defendants"), Motion for Partial Summary Judgment as to Metro-North's claims. Metro-

North's claims are not barred by the economic loss doctrine where Metro-North had a

proprietary interest in the bridge that is the subject of this litigation. At a minimum, there is a

genuine issue of material fact as to whether a proprietary interest exists.

## I.     FACTS

### A.     The Walk Bridge

For many years, commuter trains have operated on a right of way along railroad tracks

extending from New Haven, Connecticut into Grand Central Terminal, New York City,

otherwise referred to as "the New Haven Line". See **Exhibit A**, Affidavit of Richard Gans

("Gans Aff.") at ¶6. The New Haven Line also connects with three branches which service New Canaan, Danbury and Waterbury, Connecticut. See Ex. A, Gans Aff. at ¶7. The railroad tracks and appurtenances of the New Haven Line include numerous bridge spans, including a swing bridge and bridge structures spanning the Norwalk River in Norwalk, Connecticut, commonly known as the Walk Bridge (hereinafter "Walk Bridge"). See Ex. A, Gans Aff. at ¶8.

## B.    The Occurrence

On April 11, 2004, at approximately 2:40 a.m., the M/V Buchanan 3 was pushing two barges filled with stone when it came into contact with the fender system of the Walk Bridge adjacent to the western pier of the west channel. See **Exhibit B**, Defendants Answer, Special Defense and Counterclaim dated August 31, 2005 ("Defendants Answer") at ¶¶ 6 and 7; see also **Exhibit C**, Olson 1/3/06 Dep. Tr. ("Olson Dep.") at pp. 82-83. A Buchanan Marine employee, Neil Olson, was the pilot of the M/V Buchanan 3 at the time of the occurrence. See **Ex. B**, Defendants Answer at ¶ 5; see also **Ex. C**, Olson Dep. at pp. 82-83. After making contact with the fender system, Mr. Olson reversed engines and backed away from the area of the fender system. See **Ex. C** Olson Dep. at pp 82-83; see also **Exhibit D**, Agosta 5/26/06 Dep. Tr. ("Agosta Dep.") at p. 60. He then alerted Captain Cyril Armstrong of the occurrence, who then took the wheel from Mr. Olson and piloted the Buchanan 3 and the barges connected therewith through the western channel. See **Ex. C**, Olson Dep. at pp 83-84; see also **Ex. D**, Agosta Dep. at pp. 65. Once past the bridge, Captain Cyril Armstrong reversed engines and backed the Buchanan 3 into the fender system in an apparent attempt to right the fender system pushed over as a result of the initial contact. See **Ex. D**, Agosta Dep. at pp. 65 and 67.

The allisions caused significant damage to the fender system of the Walk Bridge and marine traffic through the western channel was restricted while repairs were being performed.

2

See **Exhibit E,** Photographs of damage to fender system as a result of April 11, 2004 incident produced by Buchanan Marine in their October 11, 2005 Responses to Plaintiff's Requests for Production; see also **Exhibit F,** United States Coast Guard's Local Notice to Mariner 19/04 at p. 7. Metro-North was required to devote man hours and resources to assist in the repair of the fender system and to ensure the safe operation of its trains while said repair work was being performed, all to its financial detriment. See **Exhibit G,** Willard 6/28/06 Dep. Tr. ("Willard Dep.") at pp. 54-56, 60-62.

### C.    Historical Background

On April 1, 1976, the Consolidated Rail Corporation ("Conrail") began operation of the New Haven Line commuter service with funding provided by MTA and the State of Connecticut. See **Ex. A,** Gans Aff. at ¶9. The MTA is a public benefit corporation of the State of New York. See **Ex. A,** Gans Aff. at ¶5. In 1981, Congress passed the Northeast Rail Services Act ("NRSA"). See **Ex. A,** Gans Aff. at ¶10. NRSA was enacted for purposes including the transfer of Conrail commuter service responsibilities to one or more entities whose principal purpose was to provide commuter service. See **Ex. A,** Gans Aff. at ¶11; See 45 U.S.C. §102. NRSA relieved Conrail of any legal obligation to operate commuter service as of January 1, 1983. See **Ex. A,** Gans Aff. at ¶12; See 45 U.S.C. §744a.

NRSA placed the responsibility for operating commuter service on a "commuter authority." See **Ex. A,** Gans Aff. at ¶13; See 45 U.S.C. 586(a). NRSA defines "commuter authority" as "any State, local or regional authority, corporation, or other entity established for purposes of providing commuter service, and includes the Metropolitan Transportation Authority, the Connecticut Department of Transportation ... any successor agencies and any entity created by one or more such agencies for the purpose of operating, or contracting for the

3

operation of, commuter service." See Ex. A, Gans Aff. at ¶14; See 45 U.S.C. §1104(3). NRSA provides that if a commuter authority decided to operate its own commuter service, it could initiate negotiations with Conrail for the transfer of commuter services operated by Conrail. See Ex. A, Gans Aff. at ¶15; See 45 U.S.C. §586 (a,b).

On September 22, 1982, the MTA created a subsidiary, the Metro-North Commuter Railroad Company ("Metro-North"), which is a wholly-owned public benefit subsidiary corporation of the MTA. See Ex. A, Gans Aff. at ¶16. Metro-North was the entity chosen by the MTA and CDOT to operate commuter rail service between New York and Connecticut on the New Haven Line. See Ex. A, Gans Aff., at ¶17. Metro North also operates the Hudson and Harlem railroad lines. See Ex. A, Gans Aff., at ¶17. MTA, CDOT and Metro-North entered into an Interim Service Agreement dated December 31, 1982 providing for Metro-North's operation of the New Haven Line. See Ex. A, Gans Aff. at ¶18. Metro North commenced operation of the commuter service on January 1, 1983. See Ex. A, Gans Aff. at ¶19.

Certain financial terms of the Interim Service Agreement were the subject of arbitration and on June 21, 1985, CDOT and MTA/Metro-North signed the Amended and Restated Service Agreement ("ARSA") incorporating the terms of the arbitration award. See Ex. A, Gans Aff. at ¶20; see generally **Exhibit H,** Amended and Restated Service Agreement ("ARSA"). The ARSA governs Metro-North's operation of the New Haven Line and the sharing of costs of that operation by the parties. See Ex. A, Gans Aff. at ¶20; see generally Ex. H. In 1985, the State of Connecticut exercised a lease option and acquired title to the portion of the New Haven Line located in Connecticut. See Ex. A, Gans Aff. at ¶21. The State of Connecticut owns the railroad tracks and appurtenances of the New Haven Line that are located in Connecticut, and MTA owns the railroad tracks and appurtenances of the New Haven Line that are located in New York. See

4

Ex. H, ARSA at Art. Seven, Sec. 7.01; see also Ex. A, Gans Affidavit at ¶22. The Walk Bridge and all of its appurtenances, including the fender system are part of the New Haven Line and are owned by the State of Connecticut. See Ex.H, ARSA at Article Seven, Section 7.01; see also Gans Affidavit at ¶23; see also Exhibit I, Affidavit of Fred Weaver ("Weaver Aff.") at ¶7.

### D.    The Amended and Restated Service Agreement

Although the State of Connecticut owns the Walk Bridge, Metro-North controls the day-to-day operation of the bridge. See Ex. A, Gans Aff. at ¶25-26; see also Ex. H, ARSA at Art. Two, Sec. 2.02. Metro-North is the primary user of the Walk Bridge. See Ex. A, Gans Aff. at ¶28. Article Two of ARSA governs "The Service and Its Operation." See Ex. H, ARSA at Art. Two. Article Two Section 2.01 defines "the Service" as "all activities and functions including maintenance and operations associated with the trains." See Ex. H, ARSA, at Art. Two, Sec. 2.01 (emphasis added); see also Ex. A, Gans Aff. at ¶24. Article Two, Section 2.02 of ARSA is titled "Operation of the Service" and provides in pertinent part

> **Metro-North shall have responsibility for the day-to-day operation of the Service**, as it shall be constituted from time to time pursuant to the terms of this Agreement and **shall provide the necessary crews, work force and supervisory personnel, none of whom shall be deemed to be employees of CDOT.**

See Ex. G, ARSA at Art. Two, Sec. 2.02 (emphasis added); see also Ex. A, Gans Aff. at ¶25. Metro-North employees have responsibility for the day-to-day operation of the Walk Bridge. See Ex. G, ARSA at Art. Two, Section 2.02; see also Ex. A, Gans Aff. at ¶26; see also Ex. I, Weaver Aff. at ¶5.

The opening and closing of the Walk Bridge in its normal course of operations is solely the responsibility of Metro North and its employees. See Ex. I, Weaver Aff. at ¶9. The opening and closing of the Walk Bridge requires significant manpower provided by Metro-North,

including a bridge operator, employees from the Structure Department, employees from the Power Department ("electricians"), as well as Metro-North employees from the Communications and Signals Department. Ex. I, Weaver Aff. at ¶10.

Metro-North is also responsible for maintenance of the Walk Bridge to ensure its proper operation. See Ex. H, ARSA at Art. Two, Sec. 2.01 and Sec. 2.02; see also Ex. A, Gans Aff. at ¶27; see also Ex. I, Weaver Aff. at ¶¶5-6. Metro-North forces are responsible for track inspections, electrical inspections, most of the bridge inspections, and perform all functions necessary for the opening and closing of the swing bridge to allow for the passage of marine vessels. See Ex. A, Gans Aff. at ¶29. In order to ensure the safe operation of the Walk Bridge, Metro-North employees perform monthly test openings as well as yearly inspections. See Ex. I, Weaver Aff. at ¶8.

Metro-North is further responsible for performing routine repairs of various structures, facilities and components of the New Haven Line. See Ex. I, Weaver Aff. at ¶5. Specifically, Metro-North is responsible for the operation, maintenance and routine repairs of tracks, certain stations, moveable and non-moveable bridges, certain platforms, signals, communications, and all other electrical and mechanical aspects of the New Haven Line. See Ex. I, Weaver Aff. at ¶6. Metro-North is also responsible for the performance of routine repairs to the Walk Bridge, including but not limited to repairs to bridge abutments, repairs to the machinery which swings the bridge open and closed, welding cracks and replacing bolts in the superstructure, and replacing and repairing signals and other communication components of the Walk Bridge. See Ex. I, Weaver Aff. at ¶11. Metro-North employees are also responsible for providing protection services at the Walk Bridge, including flagmen and groundsmen, while maintenance and repair

6

work is being performed by Metro-North employees and outside contractors. See **Ex. I**, Weaver
Aff. at ¶12.

## II.    LAW AND ARGUMENT

### A.    The Economic Loss Doctrine Does Not Apply When There Is Property Damage To A Proprietary Interest.

Buchanan asserts that Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303 (1927) and
its progeny bars Metro North's claims in the instant case. The Supreme Court essentially held in
Robins Dry Dock, that where a claimant sustains no physical damage to property in which it has
a proprietary interest, no recovery for unintentional maritime torts is available for purely
economic losses. Id. at 309 ("a tort to the person or property of one man does not make the tort-
feasor liable to another merely because the injured person was under a contract with that other
unknown to the doer of the wrong."); see also State of Louisiana v. M/V Testbank, 752 F.2d
1019 (5th Cir. 1985). Following Robins Dry Dock, federal maritime law has been reluctant to
recognize claims based solely on harm to an interest based on contractual relations or business
expectancy. See New Orleans Steamboat Company v. M/V James E. Wright, 1990 WL 128212
*8 (E.D.La. 1990).

However, courts have held that "[t]he rule of *Robins Dry Dock* was never intended to
apply to cases in which the plaintiff has suffered some physical damage to property in which he
has a *proprietary interest*." See Ice Fern Shipping Co., Ltd. v. Golten Service Co., Inc., 2005
WL 3692840 *4 (S.D.N.Y.)(emphasis added); quoting Pennzoil Producing Co. v. Offshore
Express, Inc., 943 F.2d 1465, 1473 (5th Cir. 1991); See Ice Fern Shipping Co., Ltd., supra, at *4;
quoting Pennzoil Producing Co, and Getty Refining & Mktg. Co. v. MT Fadi B, 766 F.2d 829
(3rd Cir. 1985) ("Indeed, '[i]n those cases in which a plaintiff suffers physical damage to some

7

property in which it has a proprietary interest, the rules of *Robins Dry Dock* and *M/V Testbank* do not apply."")

Courts have held that in order to demonstrate that a proprietary interest exists, it is *not* necessary to show actual ownership or title to the subject property. See In the Matter of the Complaint of Moran Enterprises Corporation, 77 F.Supp.2d 334, 341 (E.D.N.Y 1999). Rather, courts have applied the term "proprietary interest" in a more functional and practical way, by examining the attendant circumstances of each case. The critical factor is the character of the interest harmed and not the number of parties involved. See New Orleans Steamboat Company, supra, at *8; citing Dick Meyers Towing Service, Inc. v. United States, 577 F.2d 1023, 1025 (5th Cir. 1978). Notably, courts have held that Robins Dry Dock does not bar recovery for harm to an actual interest when the nature of the interest is *sufficiently like that of a property owner*. New Orleans Steamboat Company, supra, at *8; citing Holt Hauling & Warehouse Systems, Inc. v. M/V Ming Joy v. Holt Marine Terminal, Inc., 614 F.Supp. 890, 898 (E.D. Pa. 1985).

Accordingly, in determining whether a proprietary interest exists, courts have looked "not to formalistic doctrines of property law but to whether the particular plaintiff had possession and control of the damaged property." See Holt Hauling, supra, at 898. Courts have held that the requirements for a non-ownership proprietary interest include: (1) actual possession or control; (2) responsibility for maintenance; and (3) responsibility for repair. See IMTT-Gretna v. Robert E. Lee SS, 993 F.2d 1193, 1194 (5th Cir. 1993); citing Texas Eastern Trans. V. McMoran Offshore Explore., 877 F.2d 1214, 1225 (5th Cir.); see also Louisville & Nashville R.R. Co. v. The Tug M/V Bayou Lacombe, 597 F.2d 469 (5th Cir. 1979); see also Allders International (Ships) Ltd. v. United States, 1995 WL 251571 *2 (S.D.N.Y.).

8

In Holt Hauling, the court denied the defendant's motion for summary judgment, finding
that whether the plaintiff had a proprietary interest was a genuine issue of fact. Holt Hauling
involved damages to a pier in Gloucester, NJ resulting from an accident in which two heavy steel
coils fell onto it while cargo was being unloaded from the SS Ming Joy ("Ming Joy"), which was
owned by Yangming Marine Transport Corporation ("Yangming"). Id. At 891. The pier was
owned by Holt Hauling & Warehouse Systems, Inc. ("Holt Hauling"), who leased the pier to
Pierpoint Management Corporation ("Pierpoint"). Id. at 892. Pierpoint entered into an
agreement permitting Holt Marine Terminal, Inc. ("Holt Marine") to use the subject pier for
stevedoring purposes. Id. At the time of the subject accident, Holt Marine was a "largely
unrestricted user" of the subject pier. Id. at 893.

Holt Marine brought claims against Ming Joy seeking recovery of "stevedoring and
related revenues" related to the incapacitation of the pier. Id. Yangming moved for summary
judgment with respect to Holt Marine's claims, arguing that pursuant to Robins Dry Dock and its
progeny, Holt Marine could not recover in tort for economic losses occasioned by damage to
property in which Holt Marine had no proprietary interest. Id. The court *denied* Yangming's
motion, holding that the issue of whether Holt Marine had "sufficient 'incidents of ownership' to
render it 'proprietary' as a matter of federal maritime law" was a *material issue of fact*. Id. at
899-900. Specifically, the court examined the relationship of Holt Marine to the subject pier,
noting the following:

> The record suggests that Holt Marine both performed routine
> maintenance on the pier and purchased liability insurance for
> Pierpoint. In addition, it is undisputed that Holt Marine paid for all
> utilities necessary to its stevedoring operations. The record does
> not reveal whether Pierpoint paid for any utilities. Nor does the
> record show that Pierpoint representatives ever actually came to
> the pier. Thus, Holt Marine can argue that it was in fact the only
> party on the pier, that Pierpoint's "use" of the pier consisted of

9

> booking vessels for Holt Marine to unload. If such was the case,
> then Holt Marine's control of the pier and its operations was
> essentially complete, extending to everything but the choice of
> customers. *I find such control sufficient to survive summary
> judgment under Robins Dry Dock and its progeny.*

Id. at 900. (emphasis added). The Holt Hauling court also addressed the public policy concerns

set forth under Robins Dry Dock, stating

> "There is no danger of duplicative litigation in permitting one who
> exercises virtually unlimited control over a facility to bring suit
> when the facility suffers physical damage.    Indeed, if Holt
> Marine's version of the facts is correct, it was the only party in a
> position to protect the property by discovering damage, identifying
> its cause, and taking appropriate action in response...    It would
> serve no purpose to limit recovery to those who, under state
> property law, "owned" the facility in question. Owners (as in this
> case) may be absentees, having little to do with the day-to-day
> management of their property. Consequently, some other party,
> having stronger possessory interest and more closely involved in
> ordinary management and maintenance of the property, may be
> better able to protect the property by promptly discovering
> damage, identifying those responsible, and bringing suit against
> them.

Id. at 898; citing J. Ray McDermott & Co. v. The SS Egero, 453 F.2d 1202 (5th Cir. 1972).

In In the Matter of the Complaint of Moran Enterprises Corporation, supra, the Eastern

District of New York also dealt with the application of the Supreme Court's holding in Robins

Dry Dock. In that case, the plaintiffs, Connecticut Light and Power Company ("CL&P") and

Long Island Lighting Company ("LILCO"), brought claims against the defendant barge owners

seeking damages for repairs to submarine electrical cables running along the sea bed between

CL&P's power plant in Norwalk, CT and LILCO's power plant in Northport, NY. Id. at 335.

The damages were caused by the anchor of the subject barge, which broke loose from its

moorings. Id. The defendants moved for summary judgment against CL&P with respect to a

portion of the damages claimed by CL&P associated with emergency expenditures for the

prevention of a voltage collapse in CT. Id. at 335-336. The defendants essentially asserted that

CL&P had not suffered any direct property damage, in that it did not have a proprietary interest

in the damaged cables. Id. at 335.

The District Court for the Eastern District of New York *denied* the defendant barge

owners' motion for summary judgment, holding that material issues of fact existed regarding

whether CL&P had a proprietary interest in the subject cables. Id. at 341. In so holding, the court

reiterated that it was not necessary to show actual ownership or title, and noted the following:

> . . . plaintiff jointly contracted to have the cable built and installed;
> shared the original costs of its construction; maintain a single
> insurance policy; are jointly liable for environmental harm that
> occurs anywhere along the cable; and assumed responsibility of
> co-ownership by agreeing to share all cable related repair and
> maintenance expenses over the life of the cable.

Id. Accordingly, the court held that Robins Dry Dock did not apply.

Similarly, the court in McLean Contracting Company v. Waterman Steamship

Corporation, 131 F.Supp.2d 817 (E.D.Va. 2001) denied the defendant's motion for summary

judgment, finding that the plaintiff had an "actual proprietary interest" in the damaged property.

Id. at 821-822. In that case, the plaintiff was a contractor on a state project involving the

replacement of a railroad bridge, and the defendant was an owner of a barge that broke free from

its moorings during a hurricane and allided with one of the bridge trestles on which the

contractor was working. Id. at 818. The plaintiff brought a negligence action against the

defendant for damages to the "work-in-progress" on the trestle. The court noted that, although

the plaintiff did not own the trestle, it had "charge and care" of the entire trestle pursuant to its

contract, including the "work-in-progress". Id. at 821. The contractor was also responsible for

maintenance and required to make all necessary repairs to the project until the state gave its final

acceptance, pursuant to the contract. Id. at 821; citing Texas Eastern Trans. Corp., supra, at

11

1224-25. The court also found that the contractor had an insurable interest in the work-in-progress. Id. at 821. In denying the defendant's motion for summary judgment, the court stated that:

> [a]lthough the general principles espoused in Robins Dry Dock and Marine Navigation with respect to remote and unforeseeable damages still stand on firm footing, the Fourth Circuit had not always applied the rule of Robins Dry Dock in a mechanical fashion, *but rather has carved out exceptions where appropriate.*

Id. at 820 (emphasis added). In addressing the public policy concerns underlying the decision in Robins Dry Dock, the court took note of the fact that allowing the contractor to recover would not "open the floodgates to a limitless succession of plaintiffs," where the contractor's costs were "reasonably foreseeable". Id. at 822. Moreover, the court noted that the plaintiff's claim was not one for "indirect harm in the nature of interference of contractual obligations, the loss of business expectations, or the added cost of doing business", which are generally thought of as pure economic loss. Id.; citing Matter of Complaint of Marine Navigation Sulphur Carriers, Inc., 507 F.Supp. 205 (E.D.Va. 1980).

In New Orleans Steamboat Company, supra, the court held that the plaintiff steamboat company had a non-ownership proprietary interest in a wharf from which it operated several of its excursion vessels. See New Orleans Steamboat Company at *1. Specifically, the plaintiff brought a claim against the defendant tow owner for damages following an allision between the tow and the wharf. Id. The plaintiff sought recovery for physical damage to the wharf and for lost revenue. Id. The plaintiff did not own the wharf, but had entered into a "Preferential Assignment Agreement" with the wharf owner, by which it was responsible for repairing all damage to the wharf, maintenance and repair of the water pipes, the sewerage lines, the electric lines, and the wharf's face as well as its substructure. Id.

The court noted that the proper inquiry is whether the lessor had sufficient 'incidents of ownership' to render it 'proprietary' as a matter of law." Id. at *8; citing Holt Hauling, supra, at 899. The court stated that "[p]erformance of routine maintenance, payment of utility bills, and lack of use by the record owner are factors to be considered in determining whether a lessor has a proprietary interest sufficient to withstand the *Robins* test." Id.; citing Holt Hauling, supra, at 898. Based on these factors, the court found that the plaintiff had the requisite proprietary interest. Id. at *8.

In Domar Ocean Transportation, Ltd. v. M/V Andrew Martin, 754 F.2d 616 (5th Cir. 1985), the Fifth Circuit also applied a practical approach in determining whether a proprietary interest existed. In Domar, the plaintiff owned a barge and charted a tug to be used specifically with the barge. Id. at 617-618. The barge was damaged in a collision with another barge, and the plaintiff sought damages associated with loss of use of the tug. Id. at. 618. The court found that the plaintiff had the requisite proprietary interest in the barge and tug as a combined unit to be able to be able to recover damages for loss of optimal use of the tug which, deprived of the barge after the barge was damaged, earned less than it would have otherwise. Id. at 619. Specifically, the court concluded that the plaintiff's tug and tow were "so operated as an integral unit" that the physical damage to the barge was sufficient to allow recovery for the loss of use of both. Id. at 617. In so holding, the court looked to the fact that the plaintiff had offered its customers the use of the barge and the tug as a unit, and not as individual vessels, and the fact that the plaintiff had made improvements to the tug at its own expense so that the barge and tug could be operated together. Id. at 619.

**B.    The "Economic Loss Doctrine" Does Not Apply In The Instant Case Where Metro-North Has A Proprietary Interest In The Walk Bridge.**

Like the aforementioned cases, Robins Dry Dock does not apply in the instant case where Metro-North has the requisite proprietary interest in the Walk Bridge. Importantly, courts have found that one can have a non-ownership proprietary interest in a piece of property. Accordingly, the fact that the State of Connecticut has title to the Walk Bridge and all of its appurtenances is not a dispositive factor in this analysis. Moreover, Metro-North satisfies the three-pronged test, namely actual possession or control, responsibility for maintenance, and responsibility for repair. See IMTT-Gretna v. Robert E. Lee SS, 993 F.2d 1193, 1194 (5th Cir. 1993); citing Texas Eastern Trans. V. McMoran Offshore Explore., 877 F.2d 1214, 1225 (5th Cir.); see also Louisville & Nashville R.R. Co. v. The Tug M/V Bayou Lacombe, 597 F.2d 469 (5th Cir. 1979); see also Allders International (Ships) Ltd. v. United States, 1995 WL 251571 *2 (S.D.N.Y.).

First, Metro-North is the primary user of the Walk Bridge, and ARSA specifically provides that Metro-North shall have responsibility for controlling its day-to-day operation. See Ex. A, Gans Aff. at ¶25-26 and ¶28; see also Ex. H, ARSA at Art. Two, Sec. 2.02. This includes the opening and closing of the Walk Bridge in its normal course of operations, which necessarily requires significant manpower provided by Metro-North, including a bridge operator, employees from the Structures Department, employees from the Power Department ("electricians"), as well as employees from the Communications and Signals Department. See Ex. I, Weaver Aff. at ¶9-10. The State of Connecticut does not take part in the daily operation of the Walk Bridge, nor does it employ a workforce for that purpose. For all intents and purposes, the State of Connecticut is largely an absentee owner of the Walk Bridge. Accordingly, Metro-North

satisfies the first requirement for a non-ownership proprietary interest, namely possession and control.

Second, ARSA also specifically provides that Metro-North shall be responsible for maintenance of the Walk Bridge. See Ex. H, ARSA at Art. Two, Sec. 2.01 and Sec. 2.02; see also Ex. A, Gans Aff. at ¶27; see also Ex. I, Weaver Aff. at ¶¶5-6. In this regard, Metro-North forces are responsible for track inspections, electrical inspections, and most of the bridge inspections. See Ex. A, Gans Aff. at ¶29. Furthermore, Metro-North employees perform monthly test openings as well as yearly inspections in order to ensure the safe operation of the Walk Bridge. See Ex. I, Weaver Aff. at ¶8. Again, the State of Connecticut does not employ a workforce that is charged with performing these duties. Accordingly, Metro-North satisfies the second requirement for demonstrating a non-ownership proprietary interest.

Third, Metro-North is responsible for performing routine repairs of various structures, facilities and components of the New Haven Line. See Ex. I, Weaver Aff. at ¶5. Specifically, Metro-North is responsible for making routine repairs to tracks, certain stations, moveable and non-moveable bridges, certain platforms, signals, communications, and all other electrical and mechanical aspects of the New Haven Line. See Ex. I, Weaver Aff. at ¶6. Metro-North is also responsible for the performance of routine repairs to the Walk Bridge, including but not limited to repairs to bridge abutments, repairs to the machinery which swings the bridge open and closed, welding cracks and replacing bolts in the superstructure, and replacing and repairing signals and other communication components of the Walk Bridge. See Ex. I, Weaver Aff. at ¶11. In this regard, Metro-North employees are also responsible for providing protection services at the Walk Bridge, including flagmen and groundsmen, while maintenance and repair work is being performed by Metro-North employees and outside contractors. See Ex. I, Weaver Aff. at

15

¶12. Accordingly, Metro-North satisfies the third prong for demonstrating a non-ownership proprietary interest.

In addition to satisfying the required criteria for a non-ownership proprietary interest, the public policy concerns underlying the Robins Dry Dock decision are not present in the instant case. In Robins Dry Dock, the Supreme Court sought to limit claims for remote and unforeseeable damages. However, it is entirely foreseeable that Metro-North would be required to spend money and manpower in relation to the damaged bridge, given the fact that Metro-North controls the day-to-day operation of the bridge and is the *only* entity present at the Walk Bridge on a daily basis. Moreover, Metro-North was clearly the only party in a position to protect the Walk Bridge by discovering damage, identifying its cause, and taking appropriate action in response. See Holt Hauling, supra, at 898; citing J. Ray McDermott & Co. v. The SS Egero, 453 F.2d 1202 (5th Cir. 1972). Accordingly, allowing Metro-North to bring claims against the defendants will not open the floodgates to "duplicative litigation". Id.

Accordingly, the defendants' Motion for Partial Summary Judgment should be denied, where Metro North had a proprietary interest in the Walk Bridge.

**C.    At minimum, summary judgment should be denied where there is a genuine issue of material fact as to whether Metro-North had a proprietary interest in the Walk Bridge.**

A court may grant summary judgment "only if the pleadings and evidentiary submissions demonstrate the absence of any genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Tasini v. New York Times Co,, 192 F.3d 356, 360 (2nd Cir. 1999); see also Turner v. General Motors Acceptance Corp., 180 F.3d 451, 453 (2nd Cir. 1999). The Court must resolve all ambiguities and draw all inferences in the light most favorable to the party opposing the motion. See Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2nd Cir. 1998); see also

Twin Laboratories, Inc. v. Weider Health & Fitness, 900 F.2d 566, 568 (2nd Cir. 1990). If there
is evidence in the record as to any material fact from which an inference could be drawn in favor
of the non-movant, summary judgment is unavailable. See Holt v. KMI Continental, Inc., 95
F.3d 123, 129 (2nd Cir. 1996).

In order for the defendant to succeed in its Motion, there must be "an absence of any
genuine issues of material fact" as to whether Metro-North had "sufficient incidents of
ownership that would justify recovery for damage to physical property." See Moran, supra, at
341; quoting Louisville & Nashville R.R. Co. v. The Tug M/V Bayou Lacombe, 597 F.2d 469,
474 (5th Cir. 1979). Given the defendant's significant burden in this regard, even if this Court is
not inclined to find that Metro-North had a proprietary interest in the Walk Bridge, it is at the
very least an issue of material fact that is not appropriate for determination pursuant to F.R.C.P.
Rule 56.

Based on Metro-North's significant role with respect to the Walk Bridge, namely control
over the day-to-day operation, responsibility for maintenance and responsibility for repairs, it is
at the very least an issue of material fact as to whether Metro-North had the requisite proprietary
interest. Accordingly, summary judgment is not appropriate in the instant case.

17

## CONCLUSION

For the foregoing reasons, the defendants' Motion for Partial Summary Judgment as to

the claims of MTA/Metro-North Railroad should be denied.

THE PLAINTIFFS,
MTA METRO-NORTH RAILROAD AND
STATE OF CONNECTICUT

By: _Michael P. O'Donnell_

Michael P. O'Donnell, Esq., (ct26995)
Ryan, Ryan, Johnson & Deluca, LLP
80 Fourth Street, P.O. Box 3057
Stamford, CT   06905
Phone No. 203-357-9200

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2006, a copy of the above was mailed to the following

counsel and pro se parties of record:

Carl R. Ficks, Jr., Esq.
Halloran & Sage, LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103-4303
Attorney for Defendant, Buchanan Marine, L.P.

_Michael P. O'Donnell_

Michael P. O'Donnell, Esq.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MTA METRO-NORTH RAILROAD<br>AND STATE OF CONNECTICUT | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : CIVIL ACTION NO. 3:05 CV 881 (PCD) |
| | : |
| BUCHANAN MARINE, L.P.<br>NEIL C. OLSON | : |
| | : |
| Defendants. | : July 28, 2006 |

## LOCAL RULE 56(a)(2) STATEMENT
## IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Plaintiffs, MTA Metro-North Railroad and the State of Connecticut, by counsel and

pursuant to Local Rule 56(a)(2), hereby set forth the following responses to the Defendants'

Local Rule 56(a)(1) Statement and the Defendants' Disputed Issues of Material Fact:

### I.   Responses to the Defendants' Local Rule 56(a)(1) Statement.

1.   Admitted.

2.   Denied. See generally **Exhibit H**, Amended and Restated Service Agreement
     ("ARSA"); see also **Exhibit A**, Affidavit of Richard ("Gans Aff.") at ¶¶27-39; see
     also **Exhibit I**, Affidavit of Fred Weaver ("Weaver Aff.") at ¶¶5-6 and 8-12.

3.   Plaintiffs admit that the Norwalk River is a navigable waterway flowing through
     Norwalk, Connecticut. Plaintiffs do not have sufficient knowledge to admit or deny
     that the Norwalk River has been used by commercial marine vessels for over a
     century.

4.   Admitted.

5.   Admitted.

6.   Admitted.

7.  Admitted.

8.  Plaintiff's admit that vessels have made contact with the fender system in the western channel, but deny that the area is difficult to navigate. Plaintiffs further deny the implication that such contact is necessary in order to transit the area. See **Exhibit J,** Armstrong 1/3/06 Dep. Tr. ("Armstrong Dep.") at 43; see also **Exhibit C,** Olson 1/3/06 Dep. Tr. ("Olson") at 107.

9.  Denied only to the extent that the fender system consisted of a series of both steel and wooden piles driven into the riverbed. See Exhibit K attached to Defendants' Local Rule 56(a)(1) Statement. See also **Exhibit K,** Conlon 4/21/06 Dep. Tr. ("Conlon Dep.") at p. 125.

10. Admitted.

11. Admitted.

12. Admitted.

13. Admit only that the Hardesty & Hanover Study, dated September 2000, notes certain damage to the west fender system and recommended replacement and/or repairs to the all the fender systems of the Walk Bridge. See Exhibit N attached to Defendants' Local Rule 56(a)(1) Statement at pp. 3-11, 3-12 and 8-4.

14. Admitted.

15. Admitted.

16. Admit only that John Conlon opined that the dolphin was functionally destroyed and should have been replaced. See **Ex. K,** Conlon Dep. at pp. 69-70 and 143-144.

17. Admitted.

18. Admit only that one of the scows being pushed by the defendants made contact with the west fender system of the Walk Bridge. Plaintiffs deny that the scow was moving at a speed of less than one knot. See **Ex. C,** Olson Dep. at 46 and 72; see also **Ex. J,** Armstrong Dep. at 44.

19. Denied. See **Ex. C,** Olson Dep. at 85.

20. Admitted.

21. Metro-North admits that its damages consist of payment to a sub-contractor and internal labor costs associated with assisting in the repairs to the fender system and ensuring the safe operation of its trains while repair work was being performed. Metro-North denies the implication that these damages were purely economic. See

**Exhibit G,** Willard 6/28/06 Dep. Tr. ("Willard Dep.") at pp. 54-56; see generally **Ex. H,** ARSA; see also **Ex. A,** Gans Aff. at ¶¶27-39; see also **Ex. H,** Weaver Aff. at ¶¶5-6 and 8-12; see also **Ex. G,** Willard Dep. at pp. 54-56.

22.    Metro-North admits that its damages consist of payment to a sub-contractor who installed a navigational buoy and internal labor costs associated with assisting in the repairs to the fender system and ensuring the safe operation of its trains while repair work was being performed. Plaintiffs deny that no property interest of Metro-North was damaged on April 11, 2004. See generally **Ex. H,** ARSA; see also **Ex. A,** Gans Aff. at ¶¶27-39; see also **Ex. H,** Weaver Aff. at ¶¶5-6 and 8-12; see also **Ex. G,** Willard Dep. at pp. 54-56.

23.    Denied. See Exhibit N attached to Defendants' Local Rule 56(a)(1) Statement at p. 3-12.

24.    Denied. See generally **Ex. G,** ARSA; see also **Ex. H,** Weaver Aff. at ¶¶5-6 and 11-12.

## II.    Plaintiff's Disputed Issues of Material Fact

1.    The allisions caused significant damage to the fender system and marine traffic through the western channel was restricted while repairs were being performed. See **Exhibit E,** Photographs of damage to fender system as a result of April 11, 2004 incident produced by Buchanan Marine in their October 11, 2005 Responses to Plaintiff's Requests for Production; see also **Exhibit F,** United States Coast Guard's Local Notice to Mariner 19/04 at p. 7.

2.    Metro-North was required to devote man hours and resources to assist in the repair of the fender system and to ensure the safe operation of its trains while said repair work was being performed, all to its financial detriment. See **Ex. G,** Willard Dep. at pp. 54-56.

3.    Metro-North is the primary user of the Walk Bridge. See **Ex. A,** Gans Aff. at ¶28.

4.    Metro-North is responsible for all aspects of commuter service along the New Haven Line including maintenance and operation of the Walk Bridge. See **Ex. H,** ARSA, at Art. Two, Sec. 2.01 (emphasis added); see also **Ex. A,** Gans Aff. at ¶24.

5.    Metro-North has the responsibility for the day-to-day operation of commuter railroad service along the New Haven Line and pursuant to the Amended and Restated Service Agreement shall provide the necessary crews, work force and supervisory personnel, none of whom shall be deemed to be employees of the State of Connecticut. See **Ex. H,** ARSA at Art. Two, Sec. 2.02; see also **Ex. A,** Gans Aff. at ¶25.

6.  Metro-North employees have responsibility for the day-to-day operation of the Walk Bridge. See **Ex. H**, ARSA at Article Two, Section 2.02; see also **Ex. A**, Gans Aff. at ¶26; see also **Ex. I**, Weaver Aff. at ¶5.

7.  The opening and closing of the Walk Bridge in its normal course of operations is solely the responsibility of Metro North and its employees. See **Ex. I**, Weaver Aff. at ¶9.

8.  The opening and closing of the Walk Bridge requires significant manpower provided solely by Metro-North, including a bridge operator, employees from the Structure Department, employees from the Power Department ("electricians"), as well as Metro-North employees from the Communications and Signals Department. See **Ex. I**, Weaver Aff. at ¶10.

9.  Metro-North is responsible for maintenance of the Walk Bridge to ensure its proper operation. See **Ex. H**, ARSA at Art. Two, Sec. 2.01 and Sec. 2.02; see also **Ex. A**, Gans Aff. at ¶27; see also **Ex. I**, Weaver Aff. at ¶¶5-6 .

10.  Metro-North forces are responsible for track inspections, electrical inspections, most of the bridge inspections, and perform all functions necessary for the opening and closing of the swing bridge to allow for the passage of marine vessels. See **Ex. A**, Gans Aff. at ¶29.

11.  In order to ensure the safe operation of the Walk Bridge, Metro-North employees perform monthly test openings as well as yearly inspections. See **Ex. I**, Weaver Aff. at ¶8.

12.  Metro-North is responsible for performing routine repairs of various structures, facilities and components of the New Haven Line, including, but not limited to, the Walk Bridge and its appurtenances. See **Ex. I**, Weaver Aff. at ¶5.

13.  Metro-North is responsible for the operation, maintenance and routine repairs of tracks, certain stations, moveable and non-moveable bridges, certain platforms, signals, communications, and all other electrical and mechanical aspects of the New Haven Line. See **Ex. I**, Weaver Aff. at ¶6.

14.  Metro-North is also responsible for the performance of routine repairs to the Walk Bridge, including but not limited to repairs to bridge abutments, repairs to the machinery which swings the bridge open and closed, welding cracks and replacing bolts in the superstructure, and replacing and repairing signals and other communication components of the Walk Bridge. See **Ex. I**, Weaver Aff. at ¶11.

15.  Metro-North employees are also responsible for providing protection services at the Walk Bridge, including flagmen and groundsmen, while maintenance and repair work is being performed by Metro-North employees and outside contractors. See **Ex. I**, Weaver Aff. at ¶12.

4

16.    Metro-North has a proprietary interest in the Walk Bridge and all its appurtenances. See Exhibit G, Willard 6/28/06 Dep. Tr. ("Willard Dep.") at pp. 54-56; see generally Ex. H, ARSA; see also Ex. A, Gans Aff. at ¶¶27-39; see also Ex. H, Weaver Aff. at ¶¶5-6 and 8-12; see also Ex. G, Willard Dep. at pp. 54-56.

THE PLAINTIFFS,
MTA METRO-NORTH RAILROAD AND
STATE OF CONNECTICUT

By: _Michael P. O'Donnell_

Michael P. O'Donnell, Esq., (ct26995)
Ryan, Ryan, Johnson & Deluca, LLP
80 Fourth Street, P.O. Box 3057
Stamford, CT  06905
Phone No. 203-357-9200

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2006, a copy of the above was mailed to the following

counsel and pro se parties of record:

Carl R. Ficks, Jr., Esq.
Halloran & Sage, LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103-4303
Attorney for Defendant, Buchanan Marine, L.P.

_Michael P. O'Donnell_

Michael P. O'Donnell, Esq.