# EXHIBIT "H"

**AMENDED AND RESTATED
SERVICE AGREEMENT**

**AMONG**

**STATE OF CONNECTICUT, BY THE**

**CONNECTICUT DEPARTMENT OF TRANSPORTATION,**

**METROPOLITAN TRANSPORTATION AUTHORITY**

**AND**

**METRO-NORTH COMMUTER RAILROAD COMPANY**

**Dated as of June 21, 1985**

TABLE OF CONTENTS

Page

PARTIES   .........................................   1

RECITALS  .........................................   1

ARTICLE ONE

DEFINITIONS

Section 1.01.  Definitions ..........................   4

ARTICLE TWO

THE SERVICE AND ITS OPERATION

Section 2.01.  The Service ..........................   10

Section 2.02.  Operation of the Service .............   11

Section 2.03.  Service Fares ........................   12

Section 2.04.  Modification of the Service ..........   12

Section 2.05.  Service Meetings......................   13

Section 2.06.  Provision of Information to
               CDOT and MTA.........................   14

ARTICLE THREE

ALLOCATION AND PAYMENT OF OPERATING DEFICITS

Section 3.01.  Main Line ............................   16

Section 3.02.  Branch Lines .........................   16

Section 3.03.  Grand Central Terminal ...............   16

Page

Section 3.04.   Adjustment of Prior Payments ..........    16

Section 3.05.   General Provisions as to Payments .....    17

ARTICLE FOUR

CLASSIFICATION AND ACQUISITION
OF CAPITAL ASSETS

Section 4.01.   Classification of Capital Assets.......    20

Section 4.02.   Future Acquisition of Nonmoveable
                Capital Assets.......................    20

Section 4.03.   Future Acquisition of Moveable
                Capital Assets.......................    21

Section 4.04.   Capital Projects,.....................    22

ARTICLE FIVE

ALLOCATION AND PAYMENT OF CAPITAL COSTS

Section 5.01.   Nonmoveable Capital Assets ...........    23

Section 5.02.   Moveable Capital Assets ..............    23

Section 5.03.   CDOT Payment of Capital Costs ........    25

Section 5.04.   General Provisions as to Payments .....    25

Section 5.05.   Adjustment of Prior Payments..........    25

ARTICLE SIX

SERVICE FINANCES AND BUDGET PROCESS

Section 6.01.   Accounts .............................    26

Section 6.02.   Service Revenues .....................    28

Section 6.03.   Service Costs ........................    28

Page

Section 6.04.   Annual Budget Process ................    28

Section 6.05.   Quarterly Financial Review Meetings....    30

Section 6.06.   Capital Budget Process ...............    30

Section 6.07.   Prior Operating and Capital Expenses...    31

Section 6.08.   Five-Year Capital Plan ...............    31

## ARTICLE SEVEN

## ASSET OWNERSHIP AND MANAGEMENT

Section 7.01.   Title to Assets.......................    32

Section 7.02.   Asset Management Review...............    33

## ARTICLE EIGHT

## LABOR

Section 8.01.   Labor Negotiations....................    34

## ARTICLE NINE

## PRODUCTIVITY REVIEW

Section 9.01.   Productivity Review...................    35

Section 9.02.   Resolution of Disputes Relating
                to the Productivity Review..........    36

## ARTICLE TEN

## ARBITRATION

Section 10.01.  Settlement of Disputes...............    37

-iii-

Page

Section 10.02.   Arbitration Procedure....................   37

Section 10.03.   Financial Arbitration Procedure.........   39

Section 10.04.   Arbitration Awards......................   41

Section 10.05.   Certain Matters Not Subject To
                   Arbitration...........................   42

Section 10.06.   Enforcement of Awards...................   42

ARTICLE ELEVEN

CLAIMS

Section 11.01. Claims Prior to January 1, 1983.........   42

Section 11.02. Claims After January 1, 1983............   43

Section 11.03. Certain Claims Arising Out
                 of Incidents Involving the
                 Service and Other Railroad
                 Transportation Operated by
                 Metro-North.............................   43

Section 11.04. Selection of Counsel for the
                 Litigation of Claims....................   44

ARTICLE TWELVE

DURATION OF THE AGREEMENT

Section 12.01. Effective Date...........................   45

Section 12.02. Term.....................................   45

Section 12.03. Renewal..................................   45

Section 12.04. Termination Rights.......................   46

Section 12.05. Procedures Upon Termination..............   46

## ARTICLE THIRTEEN

## MISCELLANEOUS

Section 13.01. Notices................................. 50

Section 13.02. Office Space............................ 51

Section 13.03. Governmental and Court Approval........ 51

Section 13.04. Force Majeure .......................... 51

Section 13.05. Successors and Assigns ................ 51

Section 13.06. Past Agreements........................ 52

Section 13.07. Future Agreements...................... 53

Section 13.08. Connecticut Express Waiver of
               Sovereign Immunity.................... 53

Section 13.09. Connecticut Non-Discrimination Statute
               and Executive Orders................. 54

Section 13.10. Interpretation......................... 56

## APPENDICES

APPENDIX A.     Uniform Accounting Principles for
                Service

APPENDIX B.     Identification of Map of Grand
                Central Terminal

APPENDIX C.     Service Schedule

APPENDIX D.     Service Consists

APPENDIX E.     Service Fares

APPENDIX F.     Identification of Branch Line Maps

AMENDED AND RESTATED SERVICE AGREEMENT

Agreement dated as of June 21, 1985 among the State
of Connecticut, acting through its duly authorized agency,
the Connecticut Department of Transportation ("CDOT") by the
Commissioner of Transportation pursuant to Conn. Gen. Stat.
§ 13b-34(a), Metropolitan Transportation Authority, a public
benefit corporation of the State of New York ("MTA") and
Metro-North Commuter Railroad Company, a public benefit
corporation of the State of New York ("Metro-North").

WHEREAS, the MTA Purchase Agreement, CTA Lease
Agreement, GCT Joint Facilities Agreement and Service Con-
tract among MTA, the Penn Central Transportation Company
("PC") and the State of Connecticut, acting through its duly
authorized agency, the Connecticut Transportation Authority
of the Department of Transportation ("CTA"), executed concur-
rently on October 27, 1970 (in each case as amended to the
date hereof, and being collectively referred to as the "Serv-
ice Agreement"), provided for the provision of commuter
services by PC to MTA and CTA on the West End suburban pas-

-1-

senger train route of the former New York, New Haven and
Hartford Railroad Company;

WHEREAS, pursuant to the Regional Rail Reor-
ganization Act of 1973, on April 1, 1976, the Consolidated
Rail Corporation ("Conrail") assumed certain obligations,
including but not limited to, the operation of the Service
under the Service Agreement;

WHEREAS, following the enactment of the Northeast
Rail Service Act of 1981, 45 U.S.C. Sec. 774(a) ("NERSA"),
Conrail ceased to operate commuter services under the Service
Agreement as of December 31, 1982, and the parties hereto
entered into an amendment to the Service Agreement dated as
of December 31, 1982 (the "Interim Service Agreement")
providing for the continuation of the service (as defined
therein) pursuant to the terms thereof; and

WHEREAS, the Interim Service Agreement provided for
determination by an arbitration panel of the fair and equi-
table allocation between MTA and CDOT of the net Service
operating deficit and Service capital cost, which deter-
mination was made by an Arbitration Award released on Septem-
ber 7, 1984 (the "Award"), together with a simultaneous
exchange of agreements between MTA and CDOT on non-economic
issues; and

-2-

WHEREAS, the parties have agreed to certain modifications of the Service Agreement in addition to those necessitated by the Award; and

WHEREAS, the parties have, from time to time, entered into other agreements of relevance to operation of the Service; and

WHEREAS, for ease of administration the parties wish, to the fullest extent possible, to set forth the unchanged portions of all prior agreements, including the Service Agreement, together with the newly agreed upon amendments in one instrument (the "Amended and Restated Service Agreement" or the "Agreement");

WHEREAS, the parties intend this Amended and Restated Service Agreement to supersede all past agreements except as otherwise provided herein; and

WHEREAS, the State of Connecticut, acting though its duly authorized agency, CDOT, by the Commissioner of Transportation has made the express finding pursuant to Conn. Gen. Stat. § 13b-35 that certain specified transportation facilities with respect to which the powers conferred by Conn. Gen. Stat. § 13b-34(a) are to be exercised, namely the Service (as herein defined), may be discontinued, disrupted

-3-

or abandoned in whole or in part; the discontinuance, disruption or abandonment of such Service will be detrimental to the general welfare of the State of Connecticut, and the exercise of such powers are essential to the continuation of such necessary transportation facilities; and

WHEREAS, pursuant to said Conn. Gen. Stat. § 13b-34, the Commissioner of Transportation is authorized to contract in the name of the State of Connecticut with any person for purposes of initiating, continuing, developing, providing or improving such transportation service.

NOW THEREFORE, in consideration of the mutual promises herein contained and in order to provide for the implementation of the Award and the agreements on non-economic issues and for certain other matters relating to the operation of the Service (as herein defined), the parties hereto agree to amend and restate the Service Agreement as follows:

ARTICLE ONE

DEFINITIONS

SECTION 1.01.  Definitions.  The following terms, as used herein, have the following meanings:

"Accounts" is defined in Section 6.01.

"Administrative Assets" means those Capital Assets

-4-

owned or to be acquired which are used to perform administra-
tive functions with respect to the Service, including but not
limited to computers, train control systems, power-control
systems, automatic ticket selling and fare collection systems
and equipment, training and other facilities, buildings,
improvements and equipment or any portion thereof.

"Allocations" means MTA's and CDOT's respective
shares of the operating deficits and Capital Costs of the
Service as set forth in Articles Three and Five hereof.

"Approved Budget" for any year means the capital
and operating budgets presented by Metro-North on or about
October 1 of the preceding year as approved pursuant to the
procedures set forth in Section 6.04 below.

"Award" has the meaning set forth in the recitals
hereto.

"Branch Lines" means (a) the New Canaan Branch, (b)
the Waterbury Branch, and (c) the Danbury Branch as described
generally herein and more specifically set forth on the maps
referred to in Appendix F.

"Branch Line Service" means those portions of the
Service, as it shall be constituted from time to time, which
serve passengers who use stations along the New Canaan,
Waterbury and Danbury Branch Lines.

"Branch Lines Net Operating Deficit", calculated

-5-

according to the method set forth in Appendix A, includes all
costs of and revenues derived from providing Branch Line
Service.

"Capital Assets" means those assets used or to be
used in whole or in part for the Service which:  (1) are
deemed to be capital assets in accordance with generally
accepted accounting principles including, where applicable,
generally accepted railroad accounting principles, (2) have
an estimated useful life of more than three years from the
date of acquisition, and (3) have or had an acquisition cost
per unit of over five thousand dollars ($5,000).

"Capital Costs" means the costs, direct and
indirect, of a Capital Asset, including but not limited to
the purchase price, labor and materials costs, other
acquisition costs in accordance with generally accepted
accounting principles, and the estimated costs of contract
administration including associated overhead expenses, but
not including depreciation.

"CDOT" means the person named as "CDOT" in the
first paragraph of this Agreement.

"Danbury Branch" means that portion of the Service
extending from its junction with the Main Line in the City of
Norwalk, County of Fairfield and State of Connecticut and
thence running in a general northerly direction through the

-6-

City of Norwalk, the Towns of Wilton, Ridgefield, Redding,
Bethel and the Town and City of Danbury, all in the County of
Fairfield and State of Connecticut, to the Danbury passenger
station along with a portion of the Maybrook freight line
extending from said station to the southerly line of White
Street.

"Effective Date" means the date set forth in Sec-
tion 12.01.

"Emergency" means a Temporary situation or circum-
stance which is unforeseen and not planned for in the
Approved Budget.

"GCT Joint Facilities Agreement" has the meaning
set forth in the recitals hereto.

"Grand Central Terminal" means that portion of the
terminal building of the New Haven Line located on 42nd
Street in New York City identified in the map or maps
referred to in Appendix B hereto.

"Grand Central Terminal Net Operating Deficit",
calculated according to the method set forth in Appendix A,
means the Service's share of the net operating deficit of
Grand Central Terminal.

"Harlem Line Segment" means, for the purposes of
this Agreement only, that portion of the Main Line which
begins at milepost 0.0 at Grand Central Terminal and ends

-7-

at milepost 11.8 at Woodlawn over which the Service operates.

"Interim Service Agreement" has the meaning set forth in the recitals hereto.

"Main Line" means the New Haven Line and the allocated portions of the Harlem Line Segment which are between milepost 0.0 of the Harlem Line and 72.8 of the New Haven Line over which the Service operates, provided, however that the Main Line excludes the Branch Line Service and Grand Central Terminal.

"Main Line Net Operating Deficit", calculated according to the method set forth in Appendix A, means the net operating deficit of the Service excluding the Grand Central Terminal Net Operating Deficit and the Branch Lines Net Operating Deficit.

"Metro-North" means the person named as "Metro-North" in the first paragraph of this Agreement.

"Moveable Capital Assets" means (1) all Capital Assets which are not Nonmoveable Capital Assets and (2) all Administrative Assets.

"MTA" means the person named as "MTA" in the first paragraph of this Agreement.

"New Canaan Branch" means that portion of the Service extending from its junction with the Main Line in the Town of Stamford, County of Fairfield and State of Connec-

ticut and thence running in a general northerly direction through the Towns of Stamford, Darien, and New Canaan in the County of Fairfield and the State of Connecticut to the end of said New Canaan Branch in New Canaan.

"New Haven Line" means that portion of the Main Line which begins at milepost 11.8 at Woodlawn and ends at milepost 72.8 in New Haven, Connecticut over which the Service operates, and as further shown on the valuation maps referred to in Appendix F and being the same property over which the service has operated since January 1, 1971.

"Nonmoveable Capital Assets" means all Capital Assets excluding Administrative Assets which will not be relocated from their original site during their estimated useful life, including, but not limited to, land, stations and other buildings, real property additions, bridges, towers, track, road bed, fixed signals, third rail, catanary systems, substations and power generating plants.

"Prime Rate" means the rate of interest announced by The Connecticut Bank and Trust Company, N.A. or its successor from time to time as its prime rate.

"Service," "Service Consists" and "Service Schedule" are defined in Section 2.01.

"Service Contract" is defined in the recitals hereto.

-9-

"Service Costs" are defined in Section 6.03.

"Service Fares" are the fares charged and collected for passage on trains operated for the Service pursuant to Section 2.03.

"Service Revenues" are defined in Section 6.02.

"Temporary" means the limited period of time during which Metro-North is required to take certain acts to ensure the safe and reasonable operation of the Service where such acts are necessitated by operational, legal or safety considerations.

"Waterbury Branch" means that portion of the service extending from its junction with the Main Line in the Town of Milford and thence running in a general northerly direction through the Towns of Milford, Orange, Derby, Ansonia, Seymour, Beacon Falls and Naugatuck and the City of Waterbury, all in New Haven County and State of Connecticut, to the southerly line of Freight Street in the City of Waterbury.

## ARTICLE TWO

### THE SERVICE AND ITS OPERATION

SECTION 2.01.  The Service.  The Service shall consist of all activities and functions including maintenance and operations associated with the trains scheduled in the Service Schedule set forth in Appendix C, each such train

-10-

being made up according to the Service Consists set forth in Appendix D, as such train schedules and consists may be modified from time to time as provided in Section 2.04 below, together with any other transportation offered on a Temporary basis as a substitute.

SECTION 2.02. <u>Operation of the Service</u>. Metro-North shall have responsibility for the day-to-day operation of the Service, as it shall be constituted from time to time pursuant to the terms of this Agreement and shall provide the necessary crews, work force and supervisory personnel, none of whom shall be deemed to be employees of CDOT. The Service shall be operated with the objective of providing timely, efficient, clean and courteous service to the public on a continuing basis. Metro-North has the right to incur and charge to the Accounts all capital and operating expenses necessary to carry out its responsibility for the day-to-day operation of the Service, and to incur and charge such expenses at such times as it deems appropriate consistent with the Approved Budget. Metro-North, MTA and CDOT agree to acquire and maintain the Capital Assets which are necessary to continue the Service on the Main Line at the level of service which is agreed upon by the parties from time to time pursuant to this Agreement. For the duration of this Agreement all trains operated for the Service shall have access to the

-11-

Main Line, the New Canaan, Waterbury and Danbury Branch Lines and Grand Central Terminal.

SECTION 2.03.  <u>Service Fares</u>.  Metro-North shall charge and collect for the use of the Service the Service Fares set forth in Appendix E as amended from time to time as provided in Section 2.04 below.

SECTION 2.04.  <u>Modification of the Service</u>.

(a)  Metro-North shall have the right to amend the Service Schedule, the Service Consists, or both, with respect to the Service operated for the Main Line, subject to the prior consent of MTA and CDOT.  In addition to the foregoing, Metro-North shall have the unilateral right to make Temporary changes in the Service Schedule or Service Consists or both with respect to the Service operated for the Main Line.

(b)  MTA and CDOT shall each have the right to propose amendments to the Service Fares for the Main Line. Any such proposed amendment shall be implemented by Metro-North provided the proposed amendment is approved by both MTA and CDOT.

(c)  CDOT shall have the right to amend the Service Schedule, the Service Consists, the Service Fares, or any one of them with respect to the Branch Line Service provided however that Service Fares for Branch Line Service to or from stations on the Branch Lines to or from stations on the Main

-12-

Line or Grand Central Terminal may not be less than the fares to or from the connecting stations on the Main Line (Stamford, Norwalk or Bridgeport) to or from Grand Central Terminal or other stations on the Main Line. CDOT shall notify MTA and Metro-North of any proposed amendment to the Branch Line Service at least 60 days prior to the date on which notice of such amendment is anticipated to be made public, or longer if required by union contracts.

Notwithstanding the foregoing, Metro-North shall have the right to make Temporary changes in the Service Schedule or Service Consists or both with respect to the Branch Line Service and shall have the right to adjust schedules for the Branch Line Service by up to five minutes to allow synchronization of Branch Line schedules with Main Line schedules. Metro-North shall also have the right to propose changes in the Service Schedule, Service Consists, or Service Fares with respect to the Branch Line Service.

SECTION 2.05. Service Meetings. Upon the request of Metro-North or CDOT, service meetings shall be conducted at times and places agreeable to Metro-North and CDOT. Such meetings will be scheduled at least two weeks in advance, and shall not be required to be held more than once per month except in unusual circumstances. By written notice to the other parties one week before the scheduled meeting date,

-13-

Metro-North or CDOT may place specific items on the agenda for such meeting. In addition, by written notice to MTA and Metro-North, at least one week before the scheduled meeting date, CDOT may request that MTA attend any scheduled service meeting and MTA, if so requested, will attend.

SECTION 2.06. Provision of Information to CDOT and MTA.

(a) At such times and locations and under such advance notice and other procedures as may be agreed upon from time to time by the parties, CDOT will have access to Metro-North and MTA personnel, records, reports, payroll records of Metro-North employees and MTA employees employed by Metro-North in the Service, studies and other information concerning the operations and financing of the Service. Neither CDOT nor the State of Connecticut shall be entitled to the actual personnel records of any such individual employee of Metro-North or MTA, but shall only be entitled to the general results of any disciplinary hearings. Neither CDOT nor the State of Connecticut shall have access to any records or other personal information prohibited by NY Public Officers Law § 96 (McKinney 1983). Additionally, neither CDOT nor the State of Connecticut shall be entitled to information which is privileged or proprietary in nature to Metro-North or MTA and is being or has been prepared by Metro-

-14-