UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| MTA METRO-NORTH RAILROAD and : <br> DEPARTMENT OF TRANSPORTATION, : <br> STATE OF CONNECTICUT, : <br>         Plaintiffs,            : <br>                                : <br> vs.                            : <br>                                : <br> BUCHANAN MARINE, L.P. and      : <br> NEIL C. OLSON,                 : <br>         Defendants,           : | Civil No. 3:05cv881 (PCD) |

RULING ON MOTIONS FOR SUMMARY JUDGMENT

    This case arises out of two allisions occurring on April 11, 2004 when a tugboat, the M/V Buchanan 3, came into contact with the west fender of the "Walk Bridge" spanning the Norwalk River in Norwalk, Connecticut.  Defendants move, pursuant to Federal Rule of Civil Procedure 56, for the entry of partial summary judgment in their favor and against Plaintiff MTA Metro-North Railroad ("Metro-North"), on the ground that there are no genuine issues of material fact regarding the non-liability of Defendants with regard to the allegations made by Metro-North in Plaintiffs' Second Amended Complaint.  Plaintiffs also move, pursuant to Rule 56, for summary judgment on Defendants' First Counterclaim, arguing that there is no genuine issue of material fact as to whether Defendants can recover economic damages.  For the reasons that follow, Defendants' Motion for Summary Judgment [Doc. No. 72] is **denied** and Plaintiffs' Motion for Summary Judgment [Doc. No. 75] is **denied**.

I.    **BACKGROUND**[1]

---

[1] The statement of facts that follows is derived from Defendants' Local Rule 56(a)(1) Statement [Doc. No. 74] or from Plaintiffs' Rule 56(a)(1) Statement [Doc. No. 77].  Unless otherwise noted, the facts as set forth herein are admitted by the opposing party.

On or about April 11, 2004 and for some time prior thereto, Plaintiff, Department of Transportation of the State of Connecticut ("ConnDOT"), was the sole owner of the Walk Bridge and its fender systems.  Plaintiff, Metro-North, asserts that it is responsible for the operation, maintenance and repairs of the Walk Bridge and is its primary user. (Pls.' Local Rule 56(a)(2) Statement ¶ 2 (citing Gans Aff. ¶¶ 27-29, July 21, 2006, Ex. A to Pls.' Local Rule 56(a)(2) Statement;[2] Amended and Restated Service Agreement ("ARSA"), June 21, 1985, Ex. H to Pls.' Local Rule 56(a)(2) Statement; Weaver Aff. ¶¶ 5-6, 8-12, July 20, 2006, Ex. I to Pls.' Local Rule 56(a)(2) Statement[3]).)

The Norwalk River is a navigable waterway flowing through Norwalk, Connecticut that is used by commercial marine vessels.  The Walk Bridge is a double-opening swing bridge that carries rail lines over the Norwalk River. (See Photo, Sept. 6, 2001, Ex. I to Defs.' Local Rule 56(a)(1) Statement; Photo, Sept. 6, 2001, Ex. J to Defs.' Local Rule 56(a)(1) Statement.)  When the Walk Bridge is open, there are two navigational channels available to marine vessels, which are commonly referred to as the east and/or eastern channel and the west and/or western channel. Nearly all commercial vessels use the western channel between the west and center bridge piers. Each side of the western channel of the Walk Bridge is flanked by a wood fender system surrounding and/or adjacent to pier abutments of the Walk Bridge.  Defendants assert and Plaintiffs deny that the area of the Norwalk River in the vicinity of the Walk Bridge is difficult to navigate; however, it is admitted that marine vessels have repeatedly come into contact with the

---

[2]  Richard Gans works as Special Counsel for the Legal Department of Metro-North, and has been so employed for twelve years. (Gans Aff. ¶ 3.)

[3]  Frederick Weaver works as Deputy Director of the Track and Structures Department of Metro-North.  He has worked for Metro-North for thirty-two years, and has held the position of Deputy Director for the past eight. (Weaver Aff. ¶ 3.)

fender systems in the western channel.

The west fender system of the Walk Bridge (also known as the Pier 2 fender) consisted of a dolphin and a pier fender on April 11, 2004. The dolphin consisted of 14 wood piles lashed together and was located at the southernmost end of the west fender system. Just upriver from the dolphin, the pier fender consisted of a series of vertical and battered wood and steel piles driven into the riverbed spaced approximately three feet apart and surrounding the bridge pier. Connected to the piles were a series of four courses of horizontal planks of wood called wales. (See Photo, Sept. 6, 2001, Ex. K to Defs.' Local Rule 56(a)(1) Statement; Photo, Sept. 6, 2001, Ex. L to Defs.' Local Rule 56(a)(1) Statement.)

In 1999, ConnDOT hired a professional engineering consultant, Hardesty & Hanover, to perform an Engineering Feasibility & Economic Analysis Study ("Study") for, and a biannual inspection of, the Walk Bridge. ConnDOT paid Hardesty & Hanover approximately $1 million to perform this work. Hardesty & Hanover in turn hired another professional engineering consultant, Lane Robinson Associates, to perform an in-depth underwater investigation of the fender systems. After the underwater investigation of the west fender system was completed, both consultants advised ConnDOT in a written inspection report that the dolphin was leaning approximately fifteen degrees and displaced approximately eight feet toward the bridge pier, that at least four wood piles in the pier fender system were broken and that a fifty-foot section of the pier fender was displaced nearly one foot and leaning toward the bridge pier. Hardesty & Hanover's Study, dated September 2000, notes certain damage to the west fender system and recommended replacement and/or repairs to all of the fender systems of the Walk Bridge. (See Study, Sept. 2000, Ex. N to Defs.' Local Rule 56(a)(1) Statement.) Despite these

recommendations, however, no maintenance or any work at all was performed on the west fender system (dolphin or the pier fender) in the western channel of the Walk Bridge between May 1999 and April 11, 2004.  Plaintiffs' expert, John Conlon, testified in his deposition that the dolphin had been functionally destroyed by 1999 and should have been replaced.

On April 11, 2004 at approximately 2:40 a.m., the Buchanan 3, owned by Buchanan Marine and being operated by Defendant Neil C. Olson, was pushing two loaded barges in a northerly direction on the Norwalk River in Norwalk, Connecticut toward the Walk Bridge. While attempting to pass through the western channel of the Walk Bridge, one of the scows being pushed by Defendants made contact with the west fender system of the Walk Bridge.[4] After making contact with the fender system, Olson reversed engines and backed away from the area of the fender system.  Olson alerted Captain Cyril Armstrong of the occurrence, who then took the wheel of the Buchanan 3 in order to bring the barges through the channel. (Olson Dep. at 82-84, Ex. B to Pls.' Local Rule 56(a)(1) Statement.)  Plaintiffs contend, and Santo Agosta[5] testified at his deposition, that once Captain Armstrong made it past the bridge, he reversed engines and backed the Buchanan 3 into the fender system in an apparent attempt to right the fender system pushed over as a result of the initial contact. (See Agosta Dep. at 65-69, May 26, 2006, Ex. F to Pls.' Rule 56(a)(1) Statement.)  Another deck hand aboard the Buchanan 3 that

---

[4] Defendants assert that they were "barely moving at less than one knot" as they were attempting to pass through the western channel of the Walk Bridge. (Defs.' Local Rule 56(a)(1) Statement ¶ 18 (citing Olson Dep. at 71:20-25, 92:4-10, Jan. 3, 2006, Ex. D to Defs.' Local Rule 56(a)(1) Statement).)  Plaintiffs, however, deny this assertion. (Pls.' Local Rule 56(a)(2) Statement ¶ 18 (citing Olson Dep. at 46:1-23, 72:7-15, Jan. 3, 2006, Ex. C to Pls.' Local Rule 56(a)(2) Statement; Armstrong Dep. at 43:21-44:12, Jan. 3, 2006, Ex. J to Pls.' Local Rule 56(a)(2) Statement.)  Because Mr. Olson cannot recall the exact speed that he was going, this Court will not credit Defendants' assertion that they were "barely moving at less than one knot."

[5] Mr. Agosta is a former employee of Defendant Buchanan Marine, L.P. who was deck hand on-duty at all relevant times.

night, Timothy Pusculli, testified that Captain Armstrong did not reverse engines and go back toward the western channel after passing the Walk Bridge. (See Pusculli Dep. at 50, 53, 70, 73, 87-88, 91-92, June 26, 2006, Ex. B to Defs.' Rule 56(a)(2) Statement.)

Defendant Olson testified at his deposition that when the barge hit the west fender system, the fender system "kind of folded out a little bit, . . . but not real bad." (Olson Dep. at 84:24-85:4, Ex. C to Pls.' Local Rule 56(a)(2) Statement.) Defendants allege, however, that the west fender system of the Walk Bridge collapsed upon contact and was subsequently repaired by ConnDOT. (Defs.' Local Rule 56(a)(1) Statement ¶ 19 (citing Am. Compl., First Count ¶ 9, Aug. 30, 2005, Doc. No. 21; Ans., First Count ¶ 9, Aug. 31, 2005, Doc. No. 23.) To the extent that any "damage" was inflicted on April 11, 2004, it was limited to only the west fender system. There was no damage to the bridge pier, the railroad tracks or other railroad appurtenances of the Walk Bridge. As a result of the aforementioned incident, marine traffic through the western channel was restricted while repairs were being performed.

The damages claimed by Metro-North consist of payments to a sub-contractor who installed a navigational buoy and internal labor costs associated with assisting in the repairs to the west fender system and ensuring the safe operation of its trains while repair work was being performed. (Pls.' Rule 56(a)(2) Statement ¶¶ 21-22 (citing Willard Dep. at 54-56, June 28, 2006, Ex. G to Pls.' Rule 56(a)(2) Statement; ARSA; Gans Aff. ¶¶ 27-39; Weaver Aff. at ¶¶ 5-6, 8-12.) Metro-North denies Defendants' assertions that its damages were purely economic and that no property interest of Metro-North was damaged. (See id.)

Due to the restriction of marine traffic through the western channel, Defendant Buchanan Marine alleges, by way of a Counterclaim dated August 31, 2005, that it sustained "financial

5

harm by decreasing the amount of stone it could deliver at one time and thus, increasing the delivery costs." (Defs.' Answer, Special Defense and Counterclaim, Aug. 31, 2005, Doc. No. 23.[6]) The Buchanan 3 and the barges connected therewith did not sustain physical damage as a result of their contact with the fender system at issue on April 11, 2004.

## I.   STANDARD OF REVIEW

Summary judgment is appropriate only when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). A material fact is one which "might affect the outcome of the suit under the governing law" and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Importantly, however, "[c]onclusory allegations will not suffice to create a genuine issue." Delaware & H.R. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990).

The moving party bears the burden of establishing that summary judgment is appropriate. Anderson, 477 U.S. at 255. When moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant can satisfy its burden of establishing that there is

---

[6] Defendants filed an Answer, Special Defense and Amended Counterclaim to Plaintiffs' Second Amended Complaint on August 10, 2006.  Although this document added two new counterclaims, Count One of Defendants' Counterclaims remains essentially the same.

no genuine issue of material fact in dispute by pointing to an absence of evidence to support an essential element of the non-moving party's claim, at which point the non-moving party must "designate specific facts showing that there is a genuine issue for trial" in order to survive summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); see also Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001). In making this determination, the court draws "all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." Rodriguez v. City of N.Y., 72 F.3d 1051, 1060 (2d Cir. 1995) (citations omitted). Determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment as such are within the sole province of the jury. Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996). "If reasonable minds could differ as to the import of the evidence . . . and if . . . there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal citations omitted).

### III.  DISCUSSION

#### A.  Defendants' Motion for Summary Judgment

##### 1.  Economic Loss Doctrine

In Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 307-10, 48 S. Ct. 134, 72 L. Ed. 290 (1927), the Supreme Court established the rule, for cases involving unintentional maritime tort, that where a plaintiff sustains no physical damage to property in which it has a proprietary

interest, recovery for purely economic losses is precluded. Justice Holmes stated the "general rule" that "a tort to the person or property of one man does not make the tortfeasor liable to another merely because the injured person was under a contract with that other, unknown to the doer of the wrong." Id. at 309. Following Robins Dry Dock, courts applying federal maritime law have refused to abandon the rule that physical damage to a proprietary interest is a prerequisite to recovery for economic loss in cases of unintentional maritime tort. See, e.g., Louisiana ex rel. Guste v. M/V Testbank, 752 F.2d 1019 (5th Cir. 1985) (holding that the plaintiffs' claims for economic damages resulting from a chemical spill and subsequent river closure negligently caused by the defendant were barred under the Robins Dry Dock rule because the plaintiffs suffered no physical damage to any property in which they held a proprietary interest); Barber Lines A/S v. M/V Donau Maru, 764 F.2d 50 (1st Cir. 1985) (denying recovery for purely economic damages arising out of a fuel spill negligently caused by the defendants, following long-standing precedent, beginning with Robins Dry Dock, which holds that "one who suffers only financial loss, unaccompanied by physical injury, cannot recover damages from a negligent defendant, whether or not the financial loss is foreseeable").

Courts within the Second Circuit have also followed the rule established by Robins Dry Dock. See Petitions of Kinsman Transit Co., 388 F.2d 821, 824-25 (2d Cir. 1968) ("Kinsman II")[7] (Second Circuit denied recovery for alleged economic damages incurred when the

---

[7] Although there is language in Kinsman II indicating that the Second Circuit relied on traditional tort notions of proximate cause and foreseeability rather than on Robins Dry Dock, courts within the Second Circuit have continued to read Robins Dry Dock as establishing a "bright line" rule. See, e.g., Brown v. Royal Caribbean Cruises, Ltd., No. 99 CIV. 2435, 2000 WL 34449703, *5 (S.D.N.Y. Aug. 24, 2000); Allders Int'l (Ships) Ltd. v. United States, No. 94 CIV. 5689 (JSM), 1995 WL 251571 (S.D.N.Y. Apr. 28, 1995); Plaza Marine, Inc. v. Exxon Corp., 814 F. Supp. 334, 335 (S.D.N.Y.1993); American Dredging Co. v. Plaza Petroleum Inc., 845 F.Supp. 91 (E.D.N.Y.1993); Federal Commerce & Navigation Co. v. M/V Marathonian, 392 F.Supp. 908

defendant's vessel broke loose, crashed into and destroyed a bridge, thus making it impossible to move traffic along the river and preventing plaintiffs from delivering goods under their contracts, on the ground that the plaintiffs' vessels suffered no direct or immediate damage; rather, the recovery sought was entirely derivative of an injury to the property of a third party); Federal Commerce & Navigation Co. v. The M/V Marathonian, 528 F.2d 907, 908 (2d Cir. 1975), cert. denied, 425 U.S. 975, 96 S. Ct. 2176, 48 L. Ed. 2d 799 (1976) (affirmed, on the basis of Robins Dry Dock, the district court's denial of a time charter's claim for economic damages when his leased vessel, in which he held no property interest, was negligently damaged); Brown v. Royal Caribbean Cruises, Ltd., No. 99 CIV. 2435, 2000 WL 34449703, *5  (S.D.N.Y. Aug. 24, 2000) ("Both the Second Circuit Court of Appeals and district courts in this Circuit have followed a 'bright line' rule derived from the Supreme Court's decision in [Robins Dry Dock], which holds that plaintiffs who suffer no physical injury to their person or property from an alleged maritime tort may not recover for alleged economic losses, even though such losses may be deemed a foreseeable consequence of defendant's conduct."); In Re Moran Enters. Corp., 77 F. Supp. 2d 334, 339-40 (E.D.N.Y.1999) (noting that "the Second Circuit and other District Courts in this Circuit have subsequently reaffirmed the 'bright line' interpretation of Robins" and holding that "unless [the plaintiff] is found to have a proprietary interest in the [damaged property], the rule in Robins will apply and bar recovery of the [claimed economic damages]" )  Allders Int'l (Ships)

---

(S.D.N.Y.) (following Robins Dry Dock rule, but expressing preference for Kinsman II approach), aff'd, 528 F.2d 907 (2d Cir.1975) (recognizing continued vitality of Robins Dry Dock), cert. denied, 425 U.S. 975, 96 S. Ct. 2176, 48 L. Ed. 2d 799 (1976).  Similarly, in Testbank, the Fifth Circuit noted that the "policy considerations on which [the Kinsman] decisions are bottomed confirm our opinion that pragmatic limitations on the doctrine of foreseeability are both desirable and necessary," and found that in the Kinsman cases, the Second Circuit "recognized that foreseeability was not a panacea and that limits on the concept should be maintained." 752 F.2d at 1025-26.

Ltd. v. United States, No. 94 CIV. 5689 (JSM), 1995 WL 251571 (S.D.N.Y. Apr. 28, 1995) (following Robins Dry Dock and declining to permit plaintiff's action for economic damages where "plaintiff does not claim physical injury to its property and no special circumstances are present to warrant an exception"), aff'd, 100 F.3d 942 (2d Cir.1996); Plaza Marine, Inc. v. Exxon Corp., 814 F. Supp. 334, 335 (S.D.N.Y.1993); American Dredging Co. v. Plaza Petroleum Inc., 845 F. Supp. 91 (E.D.N.Y.1993). Although courts within and outside of the Second Circuit have questioned the reasoning and continued viability of Robins Dry Dock, it is clear that the rule established in that case remains good law, and "the Supreme Court should retain the exclusive privilege of overruling its own decisions, save perhaps when opinions already delivered have created a near certainty that only the occasion is needed for pronouncement of the doom." Federal Commerce, 528 F.2d at 907; see also Allders, 1995 WL 251571, at *2 ("Although criticized from time to time, Robins Dry Dock remains good law").

       2.      Proprietary Interest Standard

Although Robins Dry Dock bars recovery for purely economic damages when no property right has been injured, a plaintiff may recover for purely economic loss when it has suffered physical damage to a "proprietary interest." See Testbank, 752 F.2d at 1021; In re Moran Enters. Corp., 77 F. Supp. 2d at 341; Ice Fern Shipping Co., Ltd. v. Golten Service Co., Inc., No. 1:04-CV-20741, 2005 WL 3692840, *4 (S.D.N.Y. Mar. 22, 2005) ("Indeed, '[i]n those cases in which a plaintiff suffers physical damage to some property in which it has a proprietary interest, the rules of Robins Dry Rock and M/V Testbank do not apply'") (quoting Pennzoil Producing Co. v. Offshore Express, Inc., 943 F.2d 1465, 1473 (5th Cir.1991)). Actual ownership or title is not necessary to demonstrate that a proprietary interest exists; courts look to factors such as

"actual possession or control, responsibility for repair and responsibility for maintenance" in determining whether such an interest exists. In re Moran Enters. Corp., 77 F. Supp. 2d at 340-41 (quoting IMTT-Gretna v. Robert E. Lee SS, 993 F.2d 1193, 1194 (5th Cir. 1993), in turn citing Texas Eastern Trans. v. McMoran Offshore Explor., 877 F.2d 1214, 1225 (5th Cir. 1989)); see also Allders, 1995 WL 251571, at *2 (quoting Texas Eastern Transmission Co. v. McMoran Offshore Exploration Co., 877 F.2d 1214, 1225 (5th Cir.), cert. denied, 493 U.S. 937, 110 S. Ct. 332, 107 L. Ed. 2d 321 (1989)).

  Because the actual owners of property may be "absentees, having little to do with the day-to-day management of their property," and because "some other party, having a stronger possessory interest and more closely involved in ordinary management and maintenance of the property, may be better able to protect the property by promptly discovering damage, identifying those responsible, and bringing suit against them," courts have taken a practical, rather than a formalistic, approach to the question of whether a particular plaintiff's interest is one which falls outside Robins Dry Dock's proscription. Holt Hauling & Warehouse Systems, Inc. v. M/V Ming Joy v. Holt Marine Terminal, Inc., 614 F. Supp. 890, 898 (E.D. Pa. 1985).  As such, courts have considered whether a particular plaintiff was the only party present at or using the property and whether the actual owner was an "absentee" owner. See id.; see also New Orleans Steamboat Co. v. M/V James E. Wright, Nos. 87-4437, 88-1236, 1990 WL 128212 (E.D. La. Aug. 23, 1990).  In determining whether a proprietary interest exists, courts have also looked at which party performed and/or was responsible for the costs of maintenance and repairs, which party purchased insurance for the property, which party paid the utilities necessary for the property and which party is liable for damages to or caused by the property. See Holt Hauling, 614 F. Supp. at

900; New Orleans Steamboat Co., 1990 WL 128212, at *8; In re Moran Enters. Corp., 77 F. Supp. 2d at 341; McLean Contracting Co. v. Waterman Steamship Corp., 131 F. Supp. 2d 817, 820-21 (E.D. Va. 2001).

Plaintiff argues that Metro-North is the "primary user" and that the State of Connecticut is largely an "absentee owner" of the Walk Bridge. (Pls.' Mem. Opp. Defs.' Mot. Summ. J. 14.) Specifically, Plaintiff asserts that Article Two, Section 2.02 of the ARSA provides that Metro-North is responsible for controlling the day-to-day operations of the Walk Bridge, including "opening and closing [] the Walk Bridge in its normal course of operations." (Id. (citing Gans Aff. ¶¶ 25-26, 28; ARSA at Art. 2 § 2.02).)  Metro-North employs a workforce, including "a bridge operator, employees from the Structures Departments, employees from the Power Department ('electricians'), as well as employees from the Communications and Signals Department," for that purpose. (Id. (citing Weaver Aff. ¶¶ 9-10).)  The State of Connecticut, on the other hand, does not take part in the daily operation of the Walk Bridge, nor does it employ a workforce for that purpose.

The Amended and Restated Service Agreement ("ARSA") allocates interests, rights and responsibilities for the "West End suburban passenger train route" and its corresponding rail system between ConnDOT, the Metropolitan Transit Authority ("MTA") and Metro-North. Article 2 of that agreement governs "The Service and Its Operation," defining "the Service" as "all activities and functions including maintenance and operations *associated with the trains*." (ARSA at Art. 2 § 2.01) (emphasis added).  With regard to the Service, the ARSA provides in relevant part:

> Metro-North shall have responsibility for the day-to-day operation of the Service . .

> . and shall provide the necessary crews, work force and supervisory personnel, none of whom shall be deemed to be employees of CDOT. . . .

(ARSA at Art. 2 § 2.02.) Article 2 therefore explicitly gives Metro-North responsibility for maintenance and operations associated with the day-to-day operation of the *trains*; it does not explicitly delegate to Metro-North responsibility for the Walk Bridge or the west fender system at issue in this lawsuit.

Metro-North also argues that it is responsible for maintenance of the Walk Bridge. (Pls.' Mem. Opp. Defs.' Mot. Summ. J. 15.) Specifically, Richard Gans testified that "Metro-North forces are responsible for track inspection, electronic inspections, most of the bridge inspections, and perform all functions necessary for the opening and closing of the swing bridge to allow for the passage of marine vessels." (Gans Aff. ¶ 29.) Moreover, Frederick Weaver testified that "Metro-North is responsible for performing routine repairs of various structures, facilities and components of the New Haven Line," and for "the operation, maintenance and routine repairs of tracks, certain stations, moveable and non-moveable bridges, certain platforms, signals, communications, and all other electrical and mechanical aspects of the New Haven Line," and that "Metro-North employees perform monthly test openings as well as yearly inspections" in order to ensure the safe operation of the bridge. (Weaver Aff. ¶¶ 5-6, 8.) Weaver also testified that "Metro-North is also responsible for the performance of routine repairs to the Walk Bridge, including but not limited to repairs to bridge abutments, repairs to the machinery which swings the bridge open and closed, welding cracks and replacing bolts in the superstructure, and replacing and repairing signals and other communication components of the Walk Bridge," and that "Metro-North employees are [] responsible for providing protection services at the Walk

Bridge, including flagmen and groundsmen, while maintenance and repair work is being performed by Metro-North employees and outside contractors." (Id. ¶¶ 11-12.)

Defendants argue that ConnDOT "was and is the sole owner of the Walk Bridge and the subject west fender system," citing Article 7 of the ARSA, which specifically allocates "all right, title and interest in . . . Nonmoveable Capital Assets located in the State of Connecticut" — defined to include "all Capital Assets . . . which will not be relocated from their original site during their estimated useful life, including, but not limited to, . . . bridges," (ARSA at Art. 1 § 1.01) — to ConnDOT. (Defs.' Reply 3; ARSA at Art. 7 § 7.01.)  Moreover, Article 5 of the ARSA provides that "one hundred percent (100%) of the Capital Costs[8] of all Nonmoveable Capital Assets located in . . . the State of Connecticut shall be allocated to and paid by CDOT." (ARSA at Art. 5 § 5.01.)  It appears, therefore, that ConnDOT held "all right, title and interest" in the Walk Bridge and was held responsible under the ARSA for the labor and materials costs, among others, associated with the Walk Bridge.

Defendants also assert that ConnDOT had possession of and clear control over the west fender system. (Defs.' Reply 4.)  David Willard, Assistant Director of Structural Engineering for Metro-North, testified at his deposition that ConnDOT, as owner of the Walk Bridge and its fenders, ultimately has control over what work is done on the west fender and is responsible for any repairs that are done. (Willard Dep. at 5:5-9, 92:5-11, June 28, 2006, Ex. 2 to Defs.' Reply.) Mr. Willard also testified that ConnDOT is responsible for all design and construction on all railroad bridges in Connecticut. (Willard Dep. at 8:5-13.)

---

[8] "Capital Costs" includes "the costs, direct and indirect, of a Capital Asset, including but not limited to . . . labor and materials costs . . . ." (ARSA at Art. 1 § 1.01.)

ConnDOT, as owner of the Walk Bridge fenders, is required by law to maintain and repair the west fender system. See 33 U.S.C. § 502(b);[9] Conn. Gen. Stat. § 13b-51.[10]  According to Lev Laber, a Supervising Engineer in the Office of Rails at ConnDOT,[11] ConnDot hires an engineering consultant every two years to perform an inspection of the bridge and prepare a report and recommendations. (Laber Dep. at 32:4-18, 80:3-5, Apr. 5, 2006, Ex. 3 to Defs.' Reply.)  In 1999-2000, ConnDOT hired Hardesty & Hanover and paid the firm $1 million to inspect, analyze and make repair recommendations for the Walk Bridge and the west fender system.

Defendants argue that the "day-to-day operations" of the Walk Bridge referenced in Metro-North's opposition brief are limited to train travel over the bridge, and assert that Metro-North has never performed any work on the west fender system or any other fender system of the Walk Bridge.  Defendants also argue that the fact that no maintenance or work was performed on the west fender system of the Walk Bridge from May 1999 through April 11, 2004, when it collapsed, even though such were needed, indicates that Metro-North is not responsible for maintenance or repairs of the bridge or its fenders.  This argument is weakened by the fact that Defendants assert that ConnDOT was responsible for maintenance and repairs, yet it did not

---

[9] 33 U.S.C. § 502(b) provides: "No owner or operator of any bridge, drawbridge, or causeway shall endanger, unreasonably obstruct, or make hazardous the free navigation of any navigable water of the United States by reason of the failure to keep the bridge, drawbridge, or causeway and any accessory works in proper repair."

[10] The Connecticut Maritime Commission, see Conn. Gen. Stat. § 13b-51a, and the State Maritime Office, see Conn. Gen. Stat. § 13b-51b, both within ConnDOT, are responsible for all navigable rivers in Connecticut.

[11] The parties agree that Laber "has been involved with ConnDOT decisions related to the west fender system at the Walk Bridge since approximately 1990." (Defs.' Local Rule 56(a)(1) Statement ¶ 6.)

perform such during that time period either.  Finally, Defendants point to the facts that it was the State of Connecticut and not Metro-North that was obligated to and did pay for all of the engineering and construction work for the west fender system in 2004, (see Willard Dep. at 60:11-19), and that Metro-North did not carry any insurance for the Walk Bridge or the west fender system, (see Pls.' Responses to Defs.' Sept. 13, 2005 Interrogatories and Requests for Production ¶ 23, Ex. C to Defs.' Local Rule 56(a)(1) Statement).

Although Metro-North's claim that it has a proprietary interest is a weak one, the policy considerations underlying Robins Dry Dock do not mandate against a finding that Metro-North possesses a proprietary interest in the Walk Bridge and the west fender system.  Metro-North, as a primary user of the Walk Bridge, is not an unforeseeable plaintiff, and the "connection between [Defendants'] negligence and [Metro-North's] damages is [not] too tenuous and remote to permit recovery." Kinsman II, 388 F.2d at 825; see also Robins Dry Dock, 275 U.S. 303.  Metro-North asserts, and this Court will assume, that it is the only entity present at the Walk Bridge on a daily basis and therefore is in the best position to protect the Walk Bridge by discovering damage, identifying its cause and taking appropriate action in response. See Holt Hauling, 614 F. Supp. at 898.  Finally, it does not appear that permitting Metro-North to bring a claim against Defendants will open the floodgates to "duplicative litigation." Id.

   3.   Conclusion

Defendants assert that this Court should not credit the "attorney-generated" affidavit submitted by Richard Gans, Special Counsel for the Legal Department of Metro-North. (See Defs.' Reply 5-6 & n.3.)  When ruling on a motion for summary judgment, however, this Court is obligated to draw "all factual inferences in favor of the party against whom summary judgment is

sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion," Rodriguez v. City of N.Y., 72 F.3d 1051, 1060 (2d Cir. 1995) (citations omitted), and to avoid making determinations of the weight to accord evidence or assessing the credibility of witnesses, as such are within the sole province of the jury, Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996).  Although Metro-North is not the actual owner of the Walk Bridge and the west fender system, it does perform some "day-to-day operations," and asserts, via its affidavits, that it is responsible for performing and does perform repair and maintenance work.  As such, this Court finds that there is a material issue of fact remaining as to whether the west fender system is separate and distinct from the Walk Bridge and whether Metro-North possessed the requisite "proprietary interest" in the Walk Bridge and/or the west fender system necessary to permit it to recover for its economic losses.  Accordingly, Defendants' Motion for Summary Judgment is denied.

  **B.**  **Plaintiffs' Motion for Summary Judgment**

Plaintiff claims, pursuant to the rule established in Robins Dry Dock, that Defendants are barred from recovering purely economic damages.  It is undisputed that Defendants did not sustain any physical damage as a result of the incident occurring on April 11, 2004.  Defendants allege, however, that Plaintiff ConnDOT knew of the defective condition of the west fender system well before April 2004 and intentionally refused to perform any repairs or maintenance to the fender system.

It is clear that Robins Dry Dock is limited to *unintentional* torts and does not apply in cases of intentional tort. See Kaiser Aluminum & Chemical Corp. v. Marshland Dredging Co., 455 F.2d 957, 958 (5th Cir. 1972); Federal Commerce & Navigation Co. v. The M/V

Marathonian, 528 F.2d 907, 908 (2d Cir. 1975), cert. denied, 425 U.S. 975, 96 S. Ct. 2176, 48 L. Ed. 2d 799 (1976).  As such, Defendants argue that ConnDOT, by "knowingly and intentionally shunn[ing]" its obligation to keep the west fender system in proper repair pursuant to 33 U.S.C. § 502(b), committed an intentional tort. (See Defs.' Answer, Special Defense and Amended Counterclaim.)  If, as Defendants claim, the west fender system failed to accomplish its purpose due to ConnDOT's failure, knowing of the bridge's condition, to properly repair and maintain the bridge and fender system at issue, Plaintiff ConnDOT may indeed be liable for an intentional tort.  The Court finds that there is a material issue of fact as to whether ConnDOT committed an intentional tort.  As such, Plaintiffs' Motion for Summary Judgment is denied and Defendants' claim for economic damages arising out of the alleged intentional tort will stand.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. No. 72] is **denied** and Plaintiffs' Motion for Summary Judgment [Doc. No. 75] is **denied**.

SO ORDERED.

Dated at New Haven, Connecticut, December  11 , 2006.

/s/
Peter C. Dorsey, United States District Judge
District of Connecticut